UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DONNA F. PARHAM | ) | |
| | ) | |
| v. | ) | No. 2:03-0053 |
| | ) | Judge Nixon |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Griffin |
| Commissioner of Social Security. | ) | |

To: The Honorable John T. Nixon, Senior District Judge

**REPORT AND RECOMMENDATION**

The plaintiff filed this action, pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration denying the plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") as provided by the Social Security Act.

The plaintiff filed applications for DIB and SSI on November 30, 2000. (Tr. 92-94, 414-16). She alleged a disability onset date of October 25, 1995, due to "arthritis, neck [and] shoulder pain, night sweats, weak arms, depression, anxiety, leg pain, mitrol (sic) valve prolapse, back pain, [and] breast surgeries." (Tr. 92, 106, 414). The plaintiff's applications were denied initially (Tr. 70-74, 419-23), and upon reconsideration (Tr. 77-78, 426-27). A hearing was held before an Administrative Law Judge ("ALJ") on October 18, 2002 (Tr. 31-65), and on January 31, 2003, the ALJ found that the plaintiff was not disabled within the meaning of the Social Security Act (Tr. 14-21). This decision became the final decision of the Commissioner when the Appeals Council ("AC") denied the plaintiff's request for review. (Tr. 8-9).

Pending before the Court is the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), and the defendant's motion for judgment on the administrative record (Docket Entry No. 13).

I. STATEMENT OF FACTS

The plaintiff was born on July 13, 1946, making her 49 years old at the time of the alleged onset date. (Tr. 32, 92, 414). She completed the ninth grade and later received a GED. (Tr. 33). She was employed as a parts packer from October of 1985 through October of 1995, a waitress from April of 1999 through May of 1999, a housekeeper at Cumberland Medical Center from April of 2000 through June of 2000, and as an assembler and inspector of truck mirrors from August of 2000 until April 29, 2000,[1] when she was laid off along with five other employees. (Tr. 35-38, 107).

In October of 1989, the plaintiff started complaining of intermittent neck, right shoulder and arm pain. (See Tr. 183). On February 4, 1991, Dr. Marty P. Gagliardi examined the plaintiff, due to her constant shoulder pain. (Tr. 407-08). Dr. Gagliardi opined that the plaintiff fit into the "category of chronic pain syndrome and [that] there [was] not much to offer other than pain clinic referral, rehabilitation, etc." (Tr. 408). Dr. Gagliardi reported that the plaintiff suffered from a "5% permanent physical impairment to her body as a whole," and that the "prognosis for complete recovery [was] poor." (Id.)

From May 4, 1991, until May 8, 1991, the plaintiff was hospitalized at the Cumberland Medical Center, due to acute cervical sprain and cervical neuritis. (See Tr. 388). In a letter from

---

[1] The ALJ found that the plaintiff's employment after her alleged onset date was not sufficient to demonstrate that she participated in substantial gainful activity. (Tr. 15).

2

Dr. R. Donathan Ivey to the plaintiff's attorney, dated February 7, 1992, Dr. Ivey estimated a ten percent permanent partial disability to her body as a whole. (Tr. 390).

On July 9, 1992, as a result of breast pain, silicone gel implants were removed from the plaintiff's breasts, and replaced with saline implants. (Tr. 186-87, 193).

On April 19, 1994, the plaintiff saw Dr. John H. Dougherty, Jr., for a neurological evaluation. (Tr. 195-96). Dr. Dougherty found the plaintiff to be a "healthy appearing white female appearing in no distress," and noted that her clinical examination was "normal save for the decrease in sensation which appears to have a benign anatomical and physiologic pattern." (Tr. 196).

Dr. John R. Chauvin wrote a letter to the plaintiff's attorney, dated September 1, 1994, regarding a global settlement of breast implant claims. (Tr. 384). Dr. Chauvin found that, "[b]ased on [the plaintiff's] presentation and symptoms her disease category would be atypical connective tissue disease (ACTD)." The diagnosis, he stated, was "based on [the plaintiff's] complaints and documented arthralgias, myalgias, chronic fatigue, lymphadenopathy, paresthesias, along with complaints of pain in the chest and breasts and loss of functions in the breasts due to disfiguration from the multiple surgeries and contractures." (Tr. 384-85). Dr. Chauvin opined that the plaintiff's level of disability was approximately 35%. (Tr. 385).

On September 20, 1994, the plaintiff saw Dr. Jack W. Lindsay at the Cumberland Medical Center in Crossville, Tennessee. (Tr. 212). Dr. Lindsay examined the plaintiff's spine and left hip by conducting a bone scan. (Id.) He found no abnormal bone and noted normal results. (Id.)

From 1995 through 2001, the plaintiff was treated at the Quality Medical Center Walk-In Clinic in Crossville, Tennessee. (See Tr. 277-96). At the Clinic, the plaintiff complained of a soft tissue injury to her right shoulder. (See id.) During this time numerous injury and work status

3

reports were completed. (Tr. 283-84, 286-89). The April 11, 1996, and August 26, 1996, reports restricted the plaintiff's use of her right arm and shoulder for seven days. (Tr. 288-89). The December 17, 1996, report restricted the plaintiff's use of her right arm and shoulder for one month. (Tr. 287). The January 12, 1998, and March 11, 1999, reports contained no restrictions. (Tr. 284, 286). Finally, the July 2, 1999, report restricted the plaintiff from reaching her right arm above her shoulder for 14 days. (Tr. 283).

On October 27, 1999, Dr. G. Brian Holloway, of the Knoxville Orthopedic Center, diagnosed the plaintiff with rotator cuff tendinitis. (Tr. 219). Dr. Holloway injected the plaintiff with cortisone, and found that her pain was likely coming from her "neck with pain down the arm." (Tr. 220). On November 8, 1999, Dr. James Maguire reported that two MRIs of the plaintiff's neck were negative, and that it was "difficult to say with certainty the source of [the plaintiff's] pain." (Tr. 221). On December 6, 1999, Dr. Maguire reported that the plaintiff's pain "cannot be relieved with anything from a surgical standpoint." (Tr. 222).

On February 2, 2000, Dr. Donna M. Winn saw the plaintiff, whose chief complaint was that her joints hurt. (Tr. 227-28). The plaintiff told Dr. Winn that the joints involved in her pain included her "TM joints, cervical spine, shoulders, elbows, wrists, PIP's, low back, knees, ankles, hips, and the great toe on the right." (Tr. 227). Dr. Winn prescribed Vioxx, 25 mg. once a day. (Tr. 228).

On October 16, 2000, the plaintiff saw Dr. Carl M. Hollmann at the Upper Cumberland Orthopedic Surgery Center in Cookeville, Tennessee. (Tr. 272). Dr. Hollmann reported that the plaintiff had improved in the past 3-4 months with cortisone injections, and that, although she had

4

some weak rotation of her right shoulder, she could put her right arm behind her head and behind her back. (Id.)

On January 31, 2001, a consultative examination was performed by Dr. Donita Keown, a Disability Determination Services ("DDS") physician. (Tr. 249-52). Dr. Keown noted that the plaintiff had no difficulty ambulating in the clinic and no difficulty climbing onto the examining table. (Tr. 250). Upon physical examination, she found that the plaintiff had full range of motion in her neck, but complained of discomfort with manipulation to the left and right. (Id.) Dr. Keown opined that the plaintiff's weakness in her arms and hands was "most likely her subjective sense," and that her neck pain was not a significant limitation. (Tr. 252). Based on the physical examination, Dr. Keown opined that the plaintiff could sit at least six hours in an eight-hour work day, walk or stand up to six hours, and routinely lift 10 pounds and episodically lift 20 pounds. (Id.)

In a residual functional capacity assessment dated February 8, 2001 (Tr. 254-61), a DDS physician found that the plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (Tr. 255). The DDS physician found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 256-58).

In a residual functional capacity assessment dated April 30, 2001 (Tr. 262-69), a DDS physician found that the plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (Tr. 263). The DDS physician also found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 264-66).

Treatment records from Dr. Richard D. Smith are dated from June 6, 2001, to August 8, 2002. (Tr. 321-53). In reports dated June 6, 2001, and July 20, 2001, respectively, Dr. Smith noted that, although the plaintiff had fallen on her knee, X-rays of the plaintiff's thoracic spine and knee were normal. (Tr. 321-22, 326). A bone scan dated September 11, 2001, was normal. (Tr. 329). A CT scan of the abdomen dated November 16, 2001, showed some diffuse fatty infiltration of the liver, but appeared to be "within normal limits." (Tr. 332). A MRI of the cervical spine dated January 29, 2002, showed spurring at C-5 and C-6 with no extradural defects. (Tr. 336). A MRI of the thoracic spine dated April 2, 2002, showed minimal degenerative changes in the mid-thoracic spine with minimal disc bulges at T11-12. (Tr. 338). A MRI of the left lower arm dated June 11, 2002, showed only fatty tissue in the area of concern with no mass identified. (Tr. 346).

In a medical source statement dated October 17, 2002,[2] Dr. Smith reported the following limitations: lifting and/or carrying five pounds frequently and ten pounds occasionally, standing and/or walking for two hours total in an eight-hour work day (20 minutes without interruption), sitting one hour total (20 to 30 minutes without interruption), never climbing, balancing, crouching or crawling, and occasionally stooping or kneeling. (Tr. 411-13).

At the October 18, 2002, hearing before the ALJ, the plaintiff testified that she has "pain all over," but that most of her problems occur in her legs, hips, and lower back. (Tr. 42). She explained that pain in her neck, shoulder, and back kept her from seeking employment. (Tr. 49). The plaintiff further testified that she could probably stand for two hours in an eight-hour workday and sit for

---

[2]While the date in the assessment appears to be October 17, 2006 (Tr. 413), this is clearly an error. As noted by the ALJ at the October 18, 2002, hearing, this assessment was prepared by Dr. Smith on October 17, 2002. (Tr. 31).

6

three to four hours, but that, during the other period of time, she would have to lie down so she could "stretch out and get comfortable." (Tr. 44-45).

The Vocational Expert ("VE") testified that an individual with a residual functional capacity similar to that found by the DDS examiners could perform all of the plaintiff's vocationally relevant past jobs. (Tr. 59). Assuming a residual functional capacity for sedentary work not requiring reaching above shoulder level, the VE found that an individual could perform the job of an assembler. (Id.) He added that Dr. Smith's October 17, 2002, medical source statement would indicate a "severely impaired person who would need a sitter or a nursing home environment to survive," but that mild to moderate pain would not preclude the ability to perform any of the plaintiff's past jobs. (Tr. 60-61).

The ALJ's Findings

In his decision, the ALJ made the following findings:

1. The claimant met the nondisability requirements for a period of disability and disability insurance benefits set forth in section 216(i) of the Social Security Act and was insured for benefits through June 30, 2002, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since October 25, 1995.

3. The claimant has the following "severe" impairments: rotator cuff tendinitis, arthritis, degenerative disc disease, and connective tissue disease (20 CFR §§ 404.1520(b) and 416.920(b)).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. There was nothing about this healthy-appearing individual's demeanor, gait, and testimony that suggested that she was functionally impaired, nor was the testimony credibly persuasive that she has experienced pain, functional limitations, side effects of medications, depression, or any other symptoms of disabling severity.

7

Case 2:03-cv-00053   Document 16   Filed 07/18/05   Page 7 of 14 PageID #: 7

Neither was her testimony credible that she should lie down during the course of a normal work day.

6. The claimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit 2 hours; stand and/or walk 6 hours; and frequently climb, balance, stoop, kneel, crouch, crawl, push, or pull; with no reaching above shoulder level.

7. She can perform the vocationally relevant former jobs listed above (20 CFR §§ 404.1565 and 416.965).

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(e) and 416.920(e)).

(Tr. 20-21).

## II. DISCUSSION

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether or not the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. §§ 405(g) and 1382(c)(3); Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Gibson v. Secretary of Health, Education & Welfare, 678 F.2d 653 (6th Cir. 1982). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the Court might have decided the case differently based on substantial evidence to the contrary. Her v. Commissioner of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). A reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.
Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than

a mere scintilla of evidence.  Richardson, supra;  Le Master v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Court must accept the ALJ's explicit findings and determination unless the record, as a whole, is without substantial evidence to support the ALJ's determination.  Houston v. Secretary of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984);  Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

The Commissioner must employ a five-step evaluation process in determining the issue of disability.  The five steps are as follows: (1) If claimant is doing substantial gainful activity, she is not disabled; (2) If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled; (3) If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry; (4) If claimant's impairment does not prevent her from doing her past relevant work, she is not disabled; (5) Even if claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity ("RFC") and vocational factors, such as age, education, and past work experience, she is not disabled.[3]  See 20 C.F.R. § 404.1520.  See also Tyra v. Secretary of Health & Human Servs., 896 F.2d 1024, 1028-29 (6th Cir. 1990); Farris v. Secretary of Health & Human Servs., 773 F.2d 85, 88-89 (6th Cir. 1985);  Mowery v. Heckler, 771 F.2d 966, 969-70 (6th Cir. 1985);  Houston, supra.

---

[3]This latter factor is considered regardless of whether such work exists in the immediate area in which plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied.  Ragan v. Finch, 435 F.2d 239, 241 (6th Cir. 1970).

9

The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. <u>Id</u>. <u>See</u> 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. §§ 404.1512 (a), (c), 404.1513(d); <u>Landsaw v. Secretary of Health & Human Servs.</u>, 803 F.2d 211, 214 (6th Cir. 1986); <u>Tyra,</u> 896 F.2d at 1028-29. However, the Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 432(d)(2)(C); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. <u>Allen v. Califano</u>, 613 F.2d 139, 145 (6th Cir. 1980); <u>Hephner</u>, <u>supra</u>. To rebut a *prima facie* case, the Commissioner must come forward with particularized proof of the plaintiff's individual vocational qualifications to perform specific jobs. <u>O'Banner v. Secretary of Health, Education & Welfare</u>, 587 F.2d 321 (6th Cir. 1978).

Analyzing the evaluation process at step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since October 25, 1999. (Tr. 20). At step two, the ALJ determined the evidence established that the plaintiff had rotator cuff tendinitis, arthritis, degenerative disc disease, and connective tissue disease, and that they constituted severe impairments. (<u>Id</u>.) At step three, the ALJ found that the medical evidence in the record did not indicate that the plaintiff had any impairment that met the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (<u>Id</u>.) The ALJ also found that: 1) there was nothing about the plaintiff's demeanor, gait, or testimony to suggest she was functionally impaired, 2) the

10

plaintiff's testimony was not credible as to her amount of pain, functional limitation, depression, or any other symptoms of disabling severity, and 3) the plaintiff's testimony that she would need to lie down during the course of a normal work day was not credible. (Id.) At step four, the ALJ determined that the plaintiff could perform past relevant work. (Id.) Therefore, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act, and was not entitled to DIB or SSI benefits. (Tr. 20-21).

Weight Given to Medical Reports and Records

The plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Smith that was contained in his October 17, 2002, medical source statement, and that the ALJ improperly gave greater weight to the residual functional capacities completed by the DDS consultants and to Dr. Keown's consulting examination. Docket Entry No. 12, at 3. The plaintiff also argues that the combination of Dr. Chauvin's opinion that she suffered from a 35% level of disability (Tr. 385), Dr. Ivey's estimation that her percentage of disability was 10% (Tr. 390), and her own complaints of pain, equate to a "vocational disability of 100% or greater taking into consideration her age, education and work history." (Emphasis added). Docket Entry No. 12, at 4.

The opinions of treating physicians generally are entitled to greater weight than those of non-examining physicians. See Farris v. Secretary of Health and Human Servs., 773 F.2d 85, 90 (6th Cir. 1985); 20 C.F.R. § 404.1527(d). However, treating physician opinions receive controlling weight only when they are supported by sufficient clinical findings and are consistent with the evidence. 20 C.F.R. § 404.1527(d)(2). If an ALJ chooses to deviate from the treating physician rule and reject the opinion of a treating physician, he must articulate good reasons for doing so. See Bogle v.

11

Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993); Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987).

1. Dr. Smith's October 17, 2002, medical source statement

The ALJ recognized that Dr. Smith's medical source statement indicated the plaintiff's inability to work. (Tr. 19). However, the ALJ provides ample rationale for not affording Dr. Smith's opinion controlling weight. The ALJ found that: 1) Dr. Smith's assessment was "predicated entirely on the [plaintiff's] self-reported subjective symptoms," 2) there were "only minimal degenerative changes of the thoracic spine," 3) that Dr. Smith's treatment records "do not contain descriptions of physical limitations other than once in August 2001," and 4) that the plaintiff only underwent conservative treatment by taking medication. (Id.)

Based on the above, the ALJ chose to discredit the medical source statement because he found that it was unsupported by objective clinical evidence. As noted by the ALJ (Tr. 18-19), a series of objective tests, including rheumatoid arthritis testing (Tr. 226), lumbar x-rays (Tr. 212), cervical x-rays and MRIs (Tr. 221-22, 336), bone scans (Tr. 212, 329), thoracic x-rays and MRIs (Tr. 321, 326, 338), head MRIs (Tr. 200), chest x-rays (Tr. 211), x-rays and MRIs of the plaintiff's extremities (Tr. 321-22, 346), and straight leg raising tests (Tr. 251) all yielded essentially or entirely normal results. In addition, Dr. Keown (Tr. 249-52) and two DDS consulting physicians (Tr. 254-69) all opined that the plaintiff was at least capable of doing her prior range of light work. Therefore, the ALJ properly discredited Dr. Smith's opinion and substantial evidence supports his determination.

2. Dr. Chauvin's assessment, Dr. Ivey's assessment, and the plaintiff's pain complaints

The plaintiff also argues that the combination of Dr. Chauvin's opinion that she suffered from a 35% level of disability (Tr. 385), Dr. Ivey's estimation that her percentage of disability was 10% (Tr. 390), and her own complaints of pain, equate to a "vocational disability of 100% or greater taking into consideration her age, education and work history." Docket Entry No. 12, at 4.

As noted by the defendant, the relevance of Dr. Chauvin's letter is questionable, as it was written in connection with a "global settlement of breast implant claims" (Tr. 384-85), an unrelated litigation pursuant to an unknown disability standard, and because it was written over one year prior to the date on which the plaintiff claims she became disabled, October 25, 1995. The same can be said for Dr. Ivey's letter, dated February 7, 1992 (Tr. 390), since it was written to the plaintiff's attorney in connection with an unrelated litigation, and over three years prior to the plaintiff's alleged disability onset date. A pre-existing impairment which did not preclude a plaintiff from working in the past will not constitute a basis for a finding of disability. See Auer v. Secretary of Health and Human Servs., 830 F.2d 594, 595-96 (6th Cir. 1987). Therefore, the plaintiff's challenge based on the letters of Drs. Chauvin and Ivey must be rejected.

In regard to the plaintiff's contention that the ALJ did not properly evaluate the credibility of her subjective complaints of pain, allegations of pain do not constitute a disability finding "unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." Bradley v. Secretary of Health and Human Servs., 862 F.2d 1224, 1227 (6th Cir. 1988). Moreover, subjective complaints of pain must be supported by objective medical evidence in order to serve as the basis for a finding of disability. See McCoy v. Chater, 81 F.3d 44, 47 (6th Cir. 1995), cert. denied, 518 U.S. 1022 (1996); Duncan v. Secretary of Health and Human Servs.,

13

801 F.2d 847, 853 (6th Cir. 1986). Here, the ALJ found that "[t]he record as a whole does not support the [plaintiff's] allegations of symptom severity." (Tr. 19). As previously discussed, he supports this finding by listing a plethora of normal or near-normal test results. (Tr. 18-19). Thus, the record provides substantial evidence to support the ALJ's determination.

### III. RECOMMENDATION

For the reasons stated above, the Court respectfully recommends that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED, the defendant's motion for judgment on the administrative record (Docket Entry No. 13) be GRANTED, and that the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

_____
JULIET GRIFFIN
United States Magistrate Judge

14